**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190055-U

Order filed January 27, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| CITY OF PEORIA, | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Peoria County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-19-0055 |
| THE FIREFIGHTERS' PENSION FUND | ) | Circuit No. 18-MR-97 |
| OF THE CITY OF PEORIA, THE | ) | |
| TRUSTEES FOR THE FIREFIGHTERS' | ) | |
| PENSION FUND OF THE CITY OF | ) | |
| PEORIA, and ANGELA ALLEN, | ) | The Honorable |
| | ) | Katherine Gorman Hubler, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice Wright concurred in the judgment.

**ORDER**

¶ 1     *Held*:  In an appeal in an administrative-review proceeding involving a pension board's grant of a line-of-duty disability pension to an allegedly disabled firefighter, the Appellate Court found that the pension board's ruling was not against the manifest weight of the evidence.  The appellate court, therefore, confirmed the pension board's ruling.

¶ 2     Defendant, Angela Allen, a Peoria firefighter who was injured on duty while fighting a

house fire, filed an application with co-defendant, the Trustees for the Firefighters' Pension Fund

of the City of Peoria (Pension Board), for a line-of-duty disability pension. Plaintiff, the City of

Peoria (City), was allowed to intervene in the proceedings. After an evidentiary hearing, the

Pension Board found that Allen was disabled and that her disability was duty related and granted

Allen's request for a line-of-duty disability pension. The trial court upheld the Pension Board's

decision on administrative review. The City appeals, arguing that the Pension Board's decision

was erroneous. We confirm the Pension Board's ruling.

¶ 3                                            I. FACTS

¶ 4        Allen worked for the City as a firefighter for over 25 years and earned the rank of

captain. On July 18, 2015, Allen was on duty and was fighting a house fire when she slipped and

fell backward on a flight of stairs and was injured. There was no other person in the immediate

area at the time, and no one else saw Allen's accident occur. Allen completed her shift and went

home and did not immediately seek medical attention for her injuries. Two days later, when

Allen was back at work, her battalion chief ordered her to go to the hospital. Allen never

returned to full unrestricted firefighter duties after that time.

¶ 5        Over the course of the next year, Allen sought treatment for a number of medical

problems, including head, neck, back, shoulder, and arm pain; weakness in her left thumb;

vertigo; dizziness; lack of balance; nausea; headaches; cognitive problems; vision problems; and

sensitivity to light and noises. She saw several different doctors; had numerous tests, x-rays,

scans, and evaluations; and participated in physical, speech, occupational, and vision therapies.

¶ 6        In August 2016, Allen filed an application with the Pension Board for a line-of-duty

disability pension. Allen stated in her application that she was disabled from performing her

duties as a firefighter due to the "Vestibular/Ocular Motor Disorder" she had sustained as a result

of the July 2015 accident. Allen stated further in her application that the symptoms (of a

2

vestibular disorder) were numerous and included such things as: vertigo, dizziness, nausea, imbalance, trouble focusing or tracking objects with eyes, blurry vision, poor depth perception, sensitivity to loud noises or the environment, and ringing in the ears. As noted above, the City was allowed to intervene in the Pension Board proceedings.

¶ 7    Over two days in October and November 2017, the Pension Board held an evidentiary hearing on Allen's application. During the proceedings, the Pension Board heard the testimony of live witnesses and admitted into evidence numerous exhibits, including the reports and/or deposition testimony of several doctors and hundreds of pages of Allen's medical records. The evidence presented at the Pension Board hearing can be summarized as follows.[1]

¶ 8    Allen testified before the Pension Board that she had been employed by the City's fire department for about 25 years and was promoted to captain in 2008. Allen remained in that rank through the date of the accident (July 2015) and was able to perform her duties as a firefighter for the City during that time period. Up until the date of the accident, Allen did not have any problems with her upper extremity, balance, vision, or headaches; did not have any psychological issues; and did not miss work for those types of complaints.

¶ 9    During the early morning hours of July 18, 2015, Allen and other members of the fire department responded to a house fire. Allen's engine was the second unit to arrive on the scene. While working at that location, Allen was pulling hose lines around the back of the house and had gone up and down an outside wooden stairwell several times. She was wearing full fire gear—a helmet, pants, coat, gloves, and an air pack on her back  At one point while Allen was on the stairwell, she started down the steps, slipped, fell backward onto her butt and back, and saw both of her feet go above her head. Allen did not know how she landed or how she got up.

---

[1] Our recitation of the evidence does not represent the order in which the evidence was presented. We have re-arranged the order of presentation for the convenience of the reader.

She felt dazed and questioned in her mind what had just happened. At the time, Allen attributed the dazed feeling to being tired because she was on the second call of the day and had hardly gotten any sleep. The next thing that Allen remembered was talking to her battalion chief at the scene of the fire and being told to go back to what she had been doing.

¶ 10 Allen worked for the remainder of her shift. After the fire, she had to write a report and it took her a long time to do so, even though she wrote reports all the time. Allen could not figure out why she was having trouble putting words together correctly and remembering things but just assumed again that she was really tired. After her shift had ended, Allen went home for her normal two days off of work. She did not remember driving home, being home for those two days, or driving back to work at the firehouse after her days off had ended.

¶ 11 On July 20, 2015, while Allen was back at work, she had a dazed, odd feeling and was having back pain. The battalion chief told Allen to go to the hospital. Allen was irritated by the battalion chief's command but did not realize at the time that she was failing to remember things that had happened after the fall. Allen went to the emergency room for treatment.

¶ 12 Later that same month, Allen was sent to what was referred to in the testimony as the City's doctors, which was apparently an occupational medicine facility that included occupational medicine doctors, Dr. Edward Moody, Dr. Homer Pena, and Dr. David Braun. Allen told the staff or the doctors at the occupational medicine facility that she had pain in her lower back, ankles, right hand, right shoulder, neck, and left forearm. Allen also told the staff or doctors that she felt dazed and was having headaches and vision problems.

¶ 13 Allen was eventually referred by the occupational medicine doctors to a neurologist, Dr. Maria Karbowska-Jankowska (Jankowska), for further follow-up. Jankowska treated Allen;

4

referred her for speech therapy; and also referred her to Dr. Roger Fitch, an optometrist, for problems with her vision.

¶ 14    During the time that Allen was being treated by Dr. Fitch, she noticed multiple symptoms that she was having. Allen had what she described as a swimming or jagging in her vision and felt as if her visual focus was alternating in and out. The problems with her vision made her feel dizzy and unbalanced at times. In addition, Allen had a lot of strange pains in her head and could not tolerate fluorescent or bright lights, which would make her feel disoriented and confused. Although Fitch worked with Allen on those symptoms, Allen never felt that she had fully recovered with regard to her vision issues while she was under Fitch's care.

¶ 15    As for speech therapy, Allen testified that the therapist tested her and determined that her accuracy in deductive reasoning was at 23%. Allen assumed that the therapist could tell that Allen was not talking, communicating, or following instructions correctly. For example, if a person told Allen which way to go, Allen would forget what the person had said or would not know how to leave the room. Allen thought that the speech therapist was trying to retrain Allen's brain.

¶ 16    In addition to Dr. Jankowska, the City doctors also referred Allen to Dr. Gregory Adamson, an orthopedic surgeon or specialist, for treatment of Allen's complaints regarding her upper extremity. In addition, Allen also saw Dr. James Williams, an orthopedic surgeon, for upper extremity complaints.

¶ 17    In October 2015, Allen was sent by the City to Dr. Russell Glantz to have an independent medical examination conducted (apparently as part of Allen's workers' compensation case). In discussing the accident, Allen told Glantz that she had passed out after her fall because by that

time in her treatment, she had concluded that she had done so since she had a lack of memory about what had happened immediately after she fell backward.

¶ 18    At some point after the accident, Allen returned to work for a limited number of hours per week in a light-duty capacity. While performing those light-duty functions, Allen felt overwhelmed. She was bothered by the fluorescent lighting in the office and felt she was being asked to do things she could not do, such as work reports, which she had difficulty completing because she could not think clearly. In addition, Allen could not read for very long because doing so would make her feel dizzy and disoriented. Allen also struggled with noise and with people talking. Allen would feel like she was being overwhelmed by her environment and would have to climb under a desk, go into a dark room, or cover her eyes to get away from stimulation (light and sound).

¶ 19    At another point, Allen was sent by the fire department to perform training activities and simulations. During that time period, Allen was supervised by Captain Byron Yang, who was now retired. While Allen was doing the training activities, it made her dizzy to wear her helmet, so Yang gave her his helmet to wear because his helmet was lighter. Allen also felt dizzy while going through the simulator, had a lot of pain in her left arm, and was having trouble grasping things with her left thumb. There were times during the training when Allen had to go into a dark room and put her head down or had to continuously walk around to try to deal with the effects of the testing. According to Allen, she was "just lost" during those training activities and felt like she was in a daze.

¶ 20    In January 2016, Allen saw Dr. Neil Mahoney at the request of the City for a second independent medical examination (again apparently as part of Allen's workers' compensation case).

¶ 21    In July 2016, Dr. Jankowska released Allen from her care.  Allen was shocked that Jankowska released her because at that time, Allen was still having constant movement in her head or behind her eyes and was displacing colors (after looking at a color, Allen would see a spot on the wall in that same color for a period of time).  Dr. Braun, one of the City's doctors, also released Allen from his care that same month, saying that Allen had attained maximum medical improvement.  Allen was shocked by that release as well.  Allen thought, however, that Jankowska and Braun might have released her from their care because they felt that her problems were more appropriately addressed by Dr. Fitch.  The following month, Fitch released Allen from his care as well.  Allen was not feeling 100% at the time and was still having issues with her vision and balance.

¶ 22    In August 2016, Allen filed her disability pension application with the Pension Board. Two days later, the City terminated Allen's employment.

¶ 23    In April 2017, Allen was sent by her attorney to Dr. David Fletcher for an independent medical examination.

¶ 24    Since the time of her termination as a City employee up through the date of her testimony before the Pension Board, Allen's symptoms had not completely resolved.  Allen still had vision problems, but she was more tolerant of those problems and seemed to recover quicker.  Allen would wear a hat and sunglasses to help with her vision problems and to reduce glare and wore those two items during her testimony before the Pension Board.  Allen still would feel dizzy and have headaches, although her headaches were not as bad as before, and she still had a ringing in her ears.  In addition, Allen's feelings of mental fogginess never completely went away.  Allen still had memory problems, could not think clearly, was more volatile and emotional, had mood swings, and would get "overdone" by things.  Allen had trouble finding words, her mind would

7

wander, and she would have difficulty managing tasks or trying to maintain her daily activities. According to Allen, she generally did not do things as well and had to simplify the things that she did do. Allen still had pain in her left arm and shoulder, would notice twitching in her left thumb and arm, and would have her left hand lock up at times. Allen also still had some weakness in her left thumb. Allen could not exercise like she used to and could no longer go running. Allen had difficulty if she moved her head around a lot, could no longer drive, and felt like she had lost her independence. Allen no longer went out and did the things that she used to do because when she did, she would usually embarrass herself and would feel bad.

¶ 25    During her testimony, Allen acknowledged that her employment with the City had been terminated a few days after she had filed her disability pension application and that when she filed the application, she understood that she was stating that she could no longer perform her duties in the fire department. Allen acknowledged further that when she filled out the incident report on the day of the accident, she did not state in the report that she had hit her head or that she had lost consciousness. Allen denied that she had told the staff or doctors in the emergency room that she did not hit her head or lose consciousness and claimed in her testimony that she had told the staff or doctors that she did not know what had happened and that she was having headaches and vision problems. When Allen was asked during her testimony whether she had told some doctors that she had hit her head/lost consciousness and not others, Allen insisted that she had told all of the doctors the same thing about the accident. Allen acknowledged, though, that later on in her treatment, she may have told a doctor or doctors that she had hit her head because by that time in her treatment, she had assumed or had come to believe that was what had happened when she fell. Allen maintained during her testimony, however, that she had fallen back during the accident and that she did not remember anything after that point. Allen

8

acknowledged further that at one of her treatment visits with Dr. Braun, her husband told the doctor that he had been doing research on the internet regarding post-concussion syndrome.

¶ 26    At some point during her treatment, Dr. Braun wanted Allen to complete a functional capacity evaluation, but Allen refused to do so. Allen explained in her testimony that she refused to perform the evaluation because she had participated for about an hour in a similar type of test in Braun's office and was sick for several weeks after doing so due to all of the movement and everything associated with the test.

¶ 27    When Allen was asked about psychological treatment, she initially stated in her testimony that she did not recall any of her treating or consulting physicians recommending that she get psychological care. When questioned further about the matter, however, Allen stated that the doctors merely told her that she could go to counseling anytime that she wanted to do so. In addition, Allen stated that when Dr. Jankowska released Allen from her care, she told Allen that Allen might have depression and that she could offer counseling if Allen was interested, but Allen declined. Allen's speech therapist also recommended counseling, and Dr. Fletcher might have mentioned counseling as well. Allen never sought psychiatric or psychological counseling or any type of cognitive behavioral therapy. Nevertheless, Allen stated on the witness stand that she would like to talk to a counselor when she could afford to do so after the disability pension process was completed. Allen never checked, however, to see how much it would cost her out of pocket to go to counseling. In addition, although Allen filed a workers' compensation claim against the City, she never sought to have that type of treatment covered under her claim.

¶ 28    As part of the proceedings in this case, Allen was sent to three physicians by the Pension Board for independent medical examinations: Dr. Dinwiddie, Dr. Kessler, and Dr. Brooks. On

9

the witness stand, Allen was critical of the examination conducted by Dr. Kessler and stated that Kessler seemed dismissive and hurried her along.

¶ 29     During Allen's testimony, the helmet that she was wearing at the time of the accident and/or pictures of the helmet were shown to the Pension Board. The helmet had a dent in the front and some abrasions and scarring on the back edge. According to Allen, her helmet did not have that damage on either the front or the back prior to her July 2015 accident. Allen stated further that she wore her helmet front-ways when she worked, that her helmet did not fall off during the accident, and that she did not remember falling forward when the accident occurred.

¶ 30     Allen's husband, Lance Mitchell, testified that he had been married to Allen since 1998. Mitchell was a contractor and built houses for a living and had never been a firefighter. According to Mitchell, prior to the July 2015 accident, Allen had a very strong personality, was very self-conscious about her career, and was very goal-oriented and driven. The day after the accident, Allen had been lying down for a few hours, which was unlike her. When Mitchell asked Allen if something was wrong, Allen told Mitchell that she had fallen at work the previous day and that she did not feel well, had a headache, was nauseous, and that her arm was hurting very badly. Mitchell could tell that Allen was acting differently—she was not on top of everything like she had always been before. Allen was sluggish, was not thinking straight, and was not paying attention to what she was doing. Allen hardly slept for about 25 days after the accident and stayed up all night with bags of ice on her head, staring.

¶ 31     From the time of the accident until the end of 2015, Mitchell noticed that Allen was not herself, was forgetful, was not thinking straight, and always had headaches. In Mitchell's opinion, Allen's condition went "downhill" and she had those symptoms constantly. From January 2016 through the summer of 2016, Allen's symptoms did not get better. During that

time frame, Mitchell noticed that Allen was not as witty and was like a totally different person mentally. Allen would always stare and have headaches and her thinking and emotions were completely different.

¶ 32 From the middle of 2016 through the date of the Pension Board hearing, Allen's condition improved, but she was still at only about 60% of the person she had been before the accident. Mitchell believed that the person Allen used to be was gone and would never come back. Allen still had emotional issues, afflictions, mood disorder, and headaches. She still had stuff that bothered her (sight and movement) and would still shutdown mentally. Mitchell likened Allen's condition to a person with autism—if something went by Allen very quickly (presumably mentally) and she could not bring it in, she would just shutdown. From a physical standpoint, when Mitchell walked with Allen, he would have to make sure he was right beside her because he never knew if she was going to lose her balance or fall. Mitchell acknowledged during his testimony, however, that he had researched post-concussion syndrome on the internet at one point but did not recall the approximate date of when he had done so.

¶ 33 According to Mitchell, Allen was not getting any medical or psychological care at the time of the hearing because she was intimidated by the process and did not feel that she needed psychological care. Mitchell stated further that he and Allen were still receiving the City's health insurance, but they had to fight the City to receive it.

¶ 34 Retired Peoria Fire Captain Byron Yang testified that prior to the July 2015 accident, he had observed Allen performing her job duties as a fire captain with the City, and, in his opinion, Allen was very competent in performing those duties. At some point after the accident, Allen was sent to the Fire Training Academy where Yang worked, and Yang was able to observe Allen perform her duties in somewhat of a rehabilitation assignment. Yang described during his

11

testimony the training exercises that Allen was required to perform. The training/testing was done for several days over a period of time. According to Yang, Allen was able to perform all of her physical duties without compromises, but completing the training took a toll on Allen physically and she suffered physical reactions afterwards. After performing the exercises, Allen would have to isolate herself to try to recover and needed a lot longer time to do so. Allen would ask if she could go to a dark room and would, at times, put her head down. With regard to Allen's mental function, in Yang's opinion, Allen seemed to be slower and much more deliberate when performing the tests. Some of the things Yang observed with Allen were consistent with concussion symptoms. Yang had known Allen over the years and did not consider her to be a malingerer or a faker.

¶ 35    With regard to whether Allen could do her job or return to full duty, Yang's testimony before the Pension Board was somewhat inconsistent. Yang initially stated on the witness stand that he was required to report to his superiors if he thought Allen could not do her job and that he made no such report in the present case. Later in his testimony, however, Yang stated that he reported to his superiors that Allen was not able to go back to work due to her recovery time and her diminished speed in completing the exercises. Upon further clarification, Yang stated that it was not for him to decide, that he would report his observations to his superiors, and that his superiors would decide whether Allen could return to work. After even more clarification, Yang stated that Allen's slower and more deliberate performance on the exercises would not have been fit for a fire captain to return to full duty and that was what Yang had told his superiors.

¶ 36    Dr. David Fletcher testified that he had been an occupational medicine physician in Champaign, Illinois, for the past 30 years and described his background and experience for the Pension Board. In April 2017, Fletcher conducted an independent medical examination of Allen

12

at the request of Allen's attorney.  As part of his evaluation, Fletcher reviewed numerous documents, including Allen's medical records and some of her prior independent medical examinations.  Fletcher also met with Allen and obtained a medical history from her, including a description of the accident, her symptoms and when they occurred, and the treatment she received.  In addition, Fletcher performed a physical examination of Allen and interviewed Allen's husband.

¶ 37        Upon completion of the process, Fletcher found that Allen was suffering from closed head injury with no evidence of any residual cognitive dysfunction[2]; adjustment disorder (difficulty coping with the effects of the accident[3]) with mixed features of anxiety and mood; somatic symptom disorder (repressed psychological conflict manifested as physical symptoms); vestibular dysfunction (problems with the balance system of the body) as reported by Allen in her subjective history but which needed further confirmation; left anterior interosseous neuropathy (problems with the left arm and thumb), which had improved; and myofascial pain syndrome (soft tissue types of injuries, as opposed to something like a disc herniation), which was superimposed on cervical spine degenerative changes.  During his testimony, Fletcher briefly explained each of those conditions for the Pension Board.  In Fletcher's opinion, Allen could not work as a firefighter and her conditions were related to the July 2015 accident.  Fletcher did not believe that Allen was malingering, faking, or engaging in symptom magnification behavior.  In addition, although Fletcher recommended in his written report that Allen obtain cognitive behavioral therapy, he did not opine that the therapy would allow Allen to

----

[2] Fletcher believed that Allen had suffered a mild post-concussion type of syndrome (a situation where the brain had suffered an injury, but not necessarily a traumatic injury, that could manifest in headaches, vision problems, nausea, vomiting, and balance problems) but did not list that as one of his specific diagnoses in his written report.

[3] The descriptions or definitions that are provided in the parentheses after the names of the various medical conditions are generally the descriptions or definitions that were provided by the witness.

13

return to work and stated in his testimony that he was uncertain the therapy would resolve Allen's conditions. Fletcher concluded further in his written report that Allen was permanently disabled. A copy of Fletcher's written report was admitted into evidence at the Pension Board hearing over the City's objection, along with a copy of Fletcher's curriculum vitae.

¶ 38    As noted above, in addition to the live testimony presented at the hearing, the Pension Board also had before it numerous exhibits that were admitted into evidence. For the most part, those exhibits fell under three main categories: (1) Allen's medical records; (2) the written reports and curricula vitae of doctors who had conducted independent medical examinations of Allen; and (3) the deposition testimony of some of the doctors who had treated Allen. Only the second and third categories need further elaboration.

¶ 39    With regard to the second category, at the Pension Board hearing, the written reports of six doctors who had conducted independent medical examinations of Allen were admitted into evidence, along with some or all of those doctors' curricula vitae. Three of the examinations had been conducted at the Pension Board's request as part of the disability pension proceedings. The other three examinations had been conducted previously, presumably as part of Allen's workers' compensation case.

¶ 40    The first independent medical examination that was conducted of Allen at the Pension Board's request was conducted by Dr. Michal Brook, a clinical neuropsychologist, between January and February 2017. In conducting his examination, Brook reviewed numerous documents, including Allen's medical records, one or more of Allen's prior independent medical examinations, and the deposition testimony of one or more of Allen's prior treatment providers (collectively referred to hereinafter as Allen's background information). Brook also met with Allen and obtained a medical history from her, including a description of the accident, her

14

symptoms and when they occurred, and the treatment she received (collectively referred to hereinafter as a relevant history). In addition, Brook reviewed some of the psychological tests to which Allen had previously submitted and drew his own conclusions from those tests.

¶ 41      After conducting his evaluation, Brook found that Allen was suffering from two psychiatric conditions: (1) adjustment disorder with mixed anxiety and depressed mood; and (2) severe somatic symptom disorder. Brook concluded that the nature and severity of those conditions rendered Allen incapable of performing full duty (that the conditions rendered Allen disabled). Brook noted in his report that he did not believe that Allen was malingering her symptoms. In Brook's opinion, Allen's disability was likely to last until Allen's psychiatric diagnoses were successfully treated. With regard to the cause of Allen's conditions, Brook opined that Allen's disorders were a direct result of the perceived injuries Allen sustained in the July 2015 accident and the subsequent negative functional consequences thereof.

¶ 42      As to whether Allen could undergo any additional treatment that could reasonably be expected to allow her to recover from her condition and to return her to full and unrestricted firefighter duties (full duty), Brook felt that cognitive behavioral therapy—a safe form of treatment—could be used to treat Allen's condition and noted in his report that Allen's psychiatric symptoms (somatization, depression, and anxiety) had not been adequately addressed in the treatment she had received. According to Brook, the prognosis for Allen's symptoms was very good if Allen received regular and consistent empirically supported psychotherapeutic treatment. Brook believed that Allen should be able to return to full duty after her symptoms remitted but did not give an estimation as to how long that would take to occur.

¶ 43      The second independent medical examination that was conducted of Allen at the Pension Board's request was conducted by Dr. Elizabeth Kessler, a neurologist and psychiatrist, in

February 2017.  In conducting her evaluation, Kessler reviewed Allen's background information, met with Allen, and obtained from Allen a relevant history.  After completing the process, Kessler found that Allen had not suffered any type of brain or vestibular injury in the July 2015 accident and that Allen currently had no such injury that would prevent her from engaging in her usual functioning.  In making those findings, Kessler noted that Allen's initial reporting of the accident, her course of symptoms, and her objective test results did not support that either a brain or vestibular injury had occurred.  Kessler noted further that over the course of her treatment, Allen had reported inconsistent medical histories and symptoms that were grossly out of proportion to any objective abnormality or injury that Allen had sustained.  According to Kessler, other than the injury to Allen's left thumb, which was not part of Kessler's evaluation, Allen suffered only bruises as a result of the July 2015 accident and could have resumed all of her usual activities at home and at work a few days after the accident occurred.  Thus, Kessler concluded, although somewhat implicitly, that Allen was not disabled from the performance of her duties as a firefighter.  Kessler believed, therefore, that most of the treatment Allen had received over the course of the year following the accident was unnecessary.  In conducting her evaluation, Kessler was highly critical of the treatment provided by, and the statements of, Dr. Roger Fitch, the optometrist who had treated Allen for an alleged brain injury and for visual problems related to that injury.  Kessler did not address in her report whether Allen had any psychological disorders or whether such disorders were caused by the July 2015 accident.

¶ 44        The third and final independent medical examination conducted of Allen at the Pension Board's request was conducted by Dr. Stephen Dinwiddie, a psychiatrist, between January and March 2017.  In conducting his evaluation, Dinwiddie reviewed Allen's background information, met with Allen, and obtained from Allen a relevant history.  After conducting his evaluation,

16

Dinwiddie found that Allen was suffering from somatic symptom disorder and noted in his report that Allen's condition had manifested in the form of ongoing concern about neurocognitive symptoms that were not objectively substantiated (Allen had subjectively noted certain cognitive problems but objective tests had failed to demonstrate deficits in those areas). Dinwiddie commented, however, that Allen's symptoms were subjectively real to Allen. Dinwiddie went on to conclude, although somewhat implicitly, that Allen was disabled from performing her duties as a firefighter.[4] In Dinwiddie's opinion, the barrier preventing Allen from returning to work was not any neurocognitive deficit but, rather, was Allen's subjective belief that she was too impaired to do so. Although Dinwiddie acknowledged that there was a clear discrepancy between Allen's self-report and her objective test results, he did not believe that Allen was consciously exaggerating, feigning her symptoms, or malingering.

¶ 45    Because of the lack of objective support for Allen's cognitive problems, Dinwiddie considered Allen's disability to be caused by Allen's somatic symptom disorder, rather than by her July 2015 accident. Dinwiddie also stated in his report, however, that he could not render an opinion as to whether the July 2015 accident contributed to Allen's disability because there was no scientific consensus as to the cause of somatic symptom disorder.

¶ 46    Finally, with regard to whether there was any additional treatment that could reasonably be expected to return Allen to full duty, Dinwiddie did not take a firm position. Dinwiddie noted in his report that Allen's psychological complaints had not been adequately addressed and that there was some evidence to suggest that cognitive behavioral therapy could be used to treat Allen's condition, although little research had been done on the subject. Dinwiddie noted

_____

[4] Dinwiddie noted in his report that Allen's disability had substantially exceeded one year. That statement satisfies the statutory definition of "permanent disability" under the Pension Code. See 40 ILCS 5/4-105b (West 2016).

further, though, that other forms of psychotherapy were probably ineffective at best and, at worst, could focus attention on symptoms rather than on utilizing a patient's psychological strengths to overcome them. Thus, Dinwiddie believed that any opinion as to the likely effectiveness of cognitive behavioral therapy had to be offered cautiously. Nevertheless, Dinwiddie opined that Allen's return to full duty was a reasonable prognosis, if Allen was able and willing to cooperate with cognitive behavioral therapy. Dinwiddie did not state, however, any estimation as to how long such treatment would take.

¶ 47    As for the prior independent medical examinations that had (presumably) been conducted for Allen's workers' compensation case, the first such examination was conducted by Dr. Russell Glantz, a neurologist, in October 2015. In conducting his examination, Glantz reviewed Allen's background information, met with Allen, and obtained a relevant history from Allen. After completing the process, Glantz noted that from a neurological standpoint, Allen had two different categories of symptoms: (1) post-concussion type symptoms; and (2) neurological symptoms in the left arm and weakness of the left thumb. As for the post-concussion type symptoms, Glantz felt that the evidence in Allen's medical record was conflicting. Glantz noted that there was no indication initially of any type of concussional injury or symptomatology (all of Allen's initial symptoms were related to pain in different areas of her body, including her neck, feet, and left hand). Glantz found, therefore, that it was difficult to make a conclusion on a concussion-type injury since such an injury was not recorded initially. Glantz noted further that there was no objective abnormality with regard to Allen's cognitive functioning that would support Allen's subjective complaints. Glantz cautioned, however, that it was possible that all of Allen's muscular and pain-type symptoms had camouflaged her concussional injury.

18

¶ 48    With regard to Allen's left thumb weakness and numbness in her fingers, Glantz's findings were consistent with the diagnosis that had been previously stated of a partial anterior interosseous neuropathy. Glantz believed that Allen has suffered some type of stretch or compression injury to the forearm that caused the anterior interosseous dysfunction and that Allen may have also suffered a stretch injury to the brachial plexus that caused the shooting sensation down her left arm and the numbness in her left hand. In Glantz's opinion, Allen had complained of the left hand/arm symptoms within a time frame that was connectible to the July 2015 accident. Glantz believed, therefore, that Allen's left arm symptoms, including her left thumb weakness, were related to the accident.

¶ 49    Glantz opined that Allen was not at maximum medical improvement from a neurological standpoint and that it would probably take a few more months before Allen was at maximum medical improvement (two months for Allen's subjective post-concussion symptoms and a few months more for the problems with her left hand/arm). Because of Allen's subjective cognitive symptoms and the problems with Allen's left hand/arm, Glantz concluded that Allen was not yet able to perform her full duties as a firefighter for the City, even though Allen was normal from an objective neurological standpoint. Glantz did not address in his report whether Allen had any type of psychological disorder or whether any such disorder was related to the July 2015 accident, presumably because those questions were outside of Glantz's area of expertise.

¶ 50    The second independent medical examination that had been conducted previously for Allen's workers' compensation case was conducted by Dr. Neil Mahoney, a psychologist, in January 2016. In conducting his evaluation, Mahoney reviewed Allen's background information, met with Allen, obtained a relevant history from Allen, and had Allen submit to certain psychological tests. Mahoney also met with, and obtained information from, Allen's

19

husband. After completing the process, Mahoney concluded that Allen was suffering from: (1) a mild neurocognitive disorder due to head trauma; and (2) adjustment disturbance with mixed emotional features. Mahoney believed that both conditions were causally related to Allen's July 2015 accident. In reaching those conclusions, Mahoney found no evidence that Allen was malingering and noted that Allen's psychological tests suggested the absence of symptom exaggeration. Mahoney felt that Allen might benefit from short-term, problem-oriented psychological counseling, among other things. Mahoney believed that Allen was not at maximum medical improvement from a psychological standpoint and stated that it was uncertain as to when Allen would reach maximum medical improvement. Mahoney concluded, therefore, that Allen was not yet able to perform her full duties as a firefighter for the City.

¶ 51 The third independent medical examination that had been conducted previously for Allen's workers' compensation case was conducted by Dr. Chad Noggle, a clinical neuropsychologist, in June 2016. In conducting his evaluation, Noggle reviewed Allen's background information, met with Allen, and obtained from Allen a relevant history. In addition, Noggle had Allen submit to a series of psychological tests. After completing the process, Noggle found that Allen was suffering from adjustment reaction with mixed emotional features, although he recognized that one could also argue that Allen was suffering from an undifferentiated somatoform disorder. In making his findings, Noggle noted that some of the tests he had conducted suggested that Allen had a possible tendency for symptom exaggeration. Noggle believed, nevertheless, that Allen's overall test results were valid.

¶ 52 Based upon Allen's medical history, Noggle felt that it was questionable that Allen had suffered a head or traumatic brain injury in the July 2015 accident and believed, instead, that Allen's overall profile was consistent with depression and a tendency to manifest somatic

20

symptoms in the presence of emotional distress. Noggle noted that although Allen's subjective complaints suggested she had significant difficulties with cognitive functions (attention, concentration, memory, and higher-order cognitive skills), her objective data did not demonstrate that she had significant cognitive issues. In fact, Noggle saw no neurocognitive impairments that would cause Allen any occupational limitations. Noggle cautioned, however, that his findings did not mean that Allen did not experience such cognitive difficulties on an everyday basis, but it did suggest that those difficulties were not neurological in origin and were not related to the July 2015 accident. Noggle believed, therefore, that from a cognitive standpoint, Allen was currently at maximum medical improvement and that there was no objective data to suggest that Allen was unable to perform her full duties for the City's fire department. Noggle did not address in his report whether Allen's psychological disorders were caused by or related to the July 2015 accident or whether those conditions prevented Allen from being able to return to full duty.

¶ 53        Noggle later issued a supplemental report, after reviewing the three independent medical examinations conducted at the Board's request and the one conducted by Dr. Fletcher (the later examinations). Noggle stated in his supplemental report that the later examinations did not change his professional opinion on the matter.

¶ 54        As indicated above, the third category of exhibits presented at the Pension Board hearing was the evidence deposition testimony of some of the doctors who had treated Allen. The first such testimony was that of Dr. Roger Fitch, whose evidence deposition was taken in March 2016. In his deposition, Fitch testified that he was an optometrist in Peoria and that a small portion of his practice dealt with traumatic brain injuries and how those injuries were related to optical nerves. In December 2015, Fitch saw Allen for the first time after Allen was referred to him for treatment by Dr. Jankowska (a neurologist). After obtaining a history from Allen and

21

running some tests, Fitch concluded that Allen had sustained a concussion and that she was suffering from post-concussion syndrome. Fitch explained in his deposition testimony that: (1) although most concussions resolved within the first month, a small percentage did not resolve and had symptoms that could last for years; (2) post-concussion syndrome affected a patient's vestibular-ocular relationship and a patient's cognitive ability to process information; and (3) a person could test normal for cognitive function but still have vestibular problems from a traumatic brain injury.

¶ 55　　According to Fitch, Allen's main issue was peripheral movement, which would force Allen to stop, slow down, and go into protection mode. Such a response could take place, for example, if the floor was a checkerboard pattern or if there was a crowd of people with a lot of movement going on. After diagnosing Allen's condition, Fitch developed a treatment plan for Allen and described for the Pension Board the therapies he used. The purpose of those therapies was to try to assist Allen's brain to get back to normal function. During his first examination of Allen, Fitch saw no indication of symptom magnification, exaggeration, or inconsistency. Fitch acknowledged, however, that the treatment and testing he provided to Allen were dependent upon receiving accurate feedback from Allen and that if Allen was magnifying her symptoms, it could impact the degree to which Fitch's testing and treatment were valid.

¶ 56　　Fitch was still providing treatment to Allen as of the date of Fitch's evidence deposition. In Fitch's opinion, Allen was slowly getting better but had not yet reached maximum medical improvement. According to Fitch, Allen had lost several weeks of progress in therapy because of her return to work or work testing. Fitch opined further that Allen's symptoms (headaches, dizziness, blurred vision, and mood swings), condition, and treatment were all related to Allen's July 2015 accident. Fitch stated that he would not expect someone with Allen's symptoms to be

22

able to work as a firefighter and that he would not be comfortable with Allen performing her prior job duties as a fire captain.

¶ 57    The second evidence deposition testimony that was admitted at the Pension Board hearing was that of Dr. James Williams, whose deposition was takin in April 2016. In his deposition, Williams testified that he was an orthopedic surgeon in Peoria who specialized in the treatment of the hand and upper extremities. Williams first saw Allen in February 2016 and treated Allen for problems with her left arm, wrist, and thumb. After taking a complete medical history from Allen, performing a complete examination, and reviewing two scans or studies that had been conducted on Allen, Williams diagnosed Allen with an anterior interosseous nerve palsy of the left arm (an injury, which in this case appeared to be of a stretch-type nature, of the nerve that innervated the muscle that controlled the flexion or bending of the tip of the thumb), left carpal tunnel, and some left ulnar nerve cubital tunnel (an issue, also known as cubital tunnel syndrome, with the ulnar nerve on the inside of the elbow). Williams prescribed physical therapy for Allen, required that Allen work only light duty, and imposed a weight restriction on Allen's use of her left arm. About a month later, when Williams saw Allen again, Allen had made some improvement but had not yet reached maximum medical improvement. According to Williams, Allen's care had been delayed for a month because her therapy had not yet been approved. Williams kept the same work restrictions in force for Allen at that time. In Williams's opinion, Allen's condition, treatment, and restrictions were all related to Allen's July 2015 accident.

¶ 58    After all of the evidence had been presented and the attorneys had made their closing arguments, the Pension Board went into a closed session to deliberate the evidence. Upon returning from closed session, the Pension Board found that Allen was disabled for service in the

23

fire department and that her disability was duty-related and granted Allen's application for a line-of-duty disability pension.  The Pension Board later issued a written decision.  In its written decision, the Pension Board noted, among other things, that it found Allen's testimony about the July 2015 accident and her resulting injury to be credible.  The Pension Board commented that it had observed Allen's behavior during the course of the hearing and noted that while Allen testified, she wore a hat and sunglasses; that Allen asked that the room be dimly lit; that Allen would frequently turn her chair to face away from a witness and the Pension Board members; and that Allen seemed to struggle to maintain focus while answering questions.

¶ 59       On administrative review, the trial court upheld the Pension Board's decision.  The City appealed.

¶ 60                                    II. ANALYSIS

¶ 61       On appeal, the City argues that the Pension Board erred in granting Allen's application for a line-of-duty disability pension.  Specifically, the City asserts that Allen's application should have been denied because Allen failed to prove both that she was disabled and that her disability was caused by the July 2015 accident (in the line of duty).  In making that assertion, the City points out that Allen alleged in her application that she was disabled due to the vestibular/ocular motor disorder she sustained as a result of the accident, not because of any psychological disorder, as the Pension Board ultimately found.  In addition, the City asserts further that under the applicable law, the Pension Board could not make a finding that Allen was disabled because the evidence presented at the hearing established that a reasonable treatment alternative existed—cognitive behavioral therapy—that could return Allen to full service in the fire department.  For all of the reasons stated, the City asks that we set aside the Pension Board's

24

ruling and that we either remand this matter for the Pension Board to enter an order denying Allen's disability pension application or that we enter such an order ourselves.

¶ 62    The Pension Fund, the Pension Board, and Allen (collectively referred to as defendants) argue that the Pension Board's ruling was proper and should be upheld.  Defendants disagree with the City's assertion that Allen failed to meet her burden of proof and contend, instead, that the Pension Board's findings—that Allen was disabled, that her disability was caused by the 2015 accident, and that no reasonable treatment alternative existed—were not against the manifest weight of the evidence.  Defendants ask, therefore, that we confirm the Pension Board's ruling, granting Allen a line-of-duty disability pension.

¶ 63    In cases involving administrative review, the appellate court reviews the decision of the administrative agency, not the determination of the trial court.  *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006).  Judicial review of a decision of a pension board, such as the one in the present case, is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)) and extends to all questions of fact and law presented by the entire record.  See 40 ILCS 5/3-148 (West 2016); 735 ILCS 5/3-110 (West 2016); *Marconi*, 225 Ill. 2d at 531-32.  The standard of review that applies on appeal is determined by whether the question presented is one of fact, one of law, or a mixed question of fact and law.  *Marconi*, 225 Ill. 2d at 532.  As to questions of fact, the agency's decision will not be reversed on appeal unless it is against the manifest weight of the evidence.  *Id.*  Questions of law, however, are subject to *de novo* review, and mixed questions of fact and law are reviewed under the clearly erroneous standard.  *Id.*  Regardless of which standard of review applies, the plaintiff in an administrative proceeding bears the burden of proof and will be denied relief if he or she fails to sustain that burden.  *Id.* at 532-33.

25

¶ 64        In its brief on appeal, the City tries to frame the issue in this case in such a manner as to try to invoke a more favorable *de novo* or clearly erroneous standard of review.  Our supreme court, however, has already ruled upon this issue and has found that the determination of whether a person is entitled to a line-of-duty disability pension is a question of fact.  See *id.* at 534; *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007).  We are bound by that ruling.  *Angelini v. Snow*, 58 Ill. App. 3d 116, 119 (1978).  Therefore, we will not reverse the Pension Board's decision granting Allen's application for a line-of-duty disability pension unless that decision is against the manifest weight of the evidence.  See 735 ILCS 5/3-110 (West 2016) (stating that findings and conclusions of an administrative agency on questions of fact shall be held to be *prima facie* true and correct); *Marconi*, 225 Ill. 2d at 532-34.  For a reversal to be warranted under the manifest weight of the evidence standard, it must be clearly evident from the record that the administrative agency should have reached the opposite conclusion.  *Id.* at 534.  That the opposite conclusion is reasonable or that the reviewing court might have ruled differently if it were the trier of fact is not enough to justify a reversal.  *Id.*  Thus, if the record contains some competent evidence to support the agency's decision, the agency's decision should be affirmed.  See *id.*; *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 138-39 (2007).  Furthermore, when examining an administrative agency's factual findings, a reviewing court will not re-weigh the evidence presented in the administrative proceeding or substitute its judgment for that of the administrative agency.  See *Marconi*, 225 Ill. 2d at 534.

¶ 65        Turning to the merits, we note that the provisions governing the pensions of firefighters must be liberally construed in favor of the applicant.  *Roszak*, 376 Ill. App. 3d at 139.  For a municipal firefighter to obtain a line-of-duty disability pension, the firefighter must prove that: (1) he is disabled; and (2) his disability was caused by sickness, accident or injury incurred in or

resulting from the performance of an act of duty or from the cumulative effects of acts of duty. See 40 ILCS 5/4-110 (cities with 500,000 inhabitants or less), 6-151 (cities with more than 500,000 inhabitants) (West 2016); *Roszak*, 376 Ill. App. 3d at 139. To obtain such benefits, a firefighter need not prove that his duty related activities were the sole or primary cause of the disability, but rather, must only prove that his duty related activities were a contributing or exacerbating factor. *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 371 (2005).

¶ 66　　　　After reviewing the record in the present case and applying the legal principles set forth above, we conclude that the Pension Board's findings—that Allen was disabled and that her disability was caused in the line of duty—were well-supported by the evidence. First, although there were conflicts between many of the doctors findings and conclusions, there was ample evidence presented from which the Pension Board could find that Allen was disabled. Dr. Fletcher, Dr. Dinwiddie, Dr. Brook, Dr. Glantz, Dr. Mahoney, and Dr. Fitch all concluded that Allen was disabled or that Allen was unable to perform full and unrestricted firefighter duties. In addition, although some of the other doctors found that Allen was not suffering from any type of neurologic or cognitive disorder and that she was not disabled on that basis, those findings were not inconsistent with Allen being disabled based upon certain psychological conditions. Indeed, the very nature of one of Allen's psychological conditions—somatic symptom disorder—was that she was having numerous disabling subjective symptoms with no underlying neurologic or cognitive cause. Finally, Allen herself testified about the accident and the injuries, and the Pension Board found that testimony to be credible. Second, there was also ample evidence presented from which the Pension Board could find that Allen's disability was caused by the July 2015 accident (in the line of duty). Dr. Fletcher, Dr. Brook, Dr. Mahoney, and Dr. Fitch all

27

found that Allen's disability was a result of the accident or that it was at least caused in part by the accident. And, third, while there was some evidence presented to suggest that Allen could be returned to full service in the fire department through cognitive behavioral therapy, there was also some evidence presented to suggest that the potential for success of such a treatment alternative was either unlikely or unknown and no evidence was presented to establish how long such a treatment alternative would have taken. Thus, the Pension Board's implicit conclusion that no reasonable treatment alternative existed was supported by the evidence. Because the Pension Board's findings were supported by the evidence presented, we confirm the Pension Board's ruling, granting Allen's application for a line-of-duty disability pension.

¶ 67    In reaching that conclusion, we reject the City's assertion that the Pension Board somehow erred by finding that Allen was disabled due to her psychological conditions when Allen's specific allegation in her disability pension application was that she was disabled due to a vestibular/ocular motor disorder. Although Allen listed her condition in the application as a vestibular/ocular motor disorder, many of the symptoms that Allen also listed in the application as being from a vestibular disorder were the same symptoms that Allen was found to be suffering from as a result of her psychological disorders. Thus, we believe that Allen sufficiently alleged the nature of her disability in her disability pension application. Indeed, the City has made no argument on appeal that it was surprised by the evidence presented or that the manner in which Allen's condition was described in the application somehow deprived the City of a fair opportunity to prepare for the hearing before the Pension Board.

¶ 68                                III. CONCLUSION

¶ 69    For the foregoing reasons, we confirm the judgment of the Trustees for the Firefighters' Pension Fund of the City of Peoria.

28

¶ 70        Confirmed.